IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARTIN and LISA WHITEMAN,

     Plaintiffs,

v.                               Civil Action No. 5:11CV31
                                         (STAMP)

CHESAPEAKE APPALACHIA, LLC,

     Defendant.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  Procedural History

The plaintiffs, Martin and Lisa Whiteman, commenced this civil action in the Circuit Court of Wetzel County, West Virginia by filing a complaint alleging that the defendant, Chesapeake Appalachia, LLC ("Chesapeake"), deposited drill cuttings and waste in pits on their land, constituting a physical intrusion in violation of their property rights.  The plaintiffs seek an injunction requiring removal of the waste and remediation of any and all contaminated areas of their property.  The complaint sets forth claims of nuisance, trespass, negligence, strict liability, intentional infliction of emotional distress, and negligent infliction of emotional distress.  The defendant then removed the case to this Court.

Subsequently, the plaintiffs filed a motion for partial summary judgment. In support of this motion, the plaintiffs argue: (1) the defendant is entitled to extract minerals from the plaintiffs' property using only so much surface as is reasonably necessary for extraction, and that limited right does not include the right to permanent residual industrial waste disposal; (2) mineral law widely recognizes that a mineral owner's permanent waste disposal or purely optional occupation of a surface owner's property is a trespass; (3) the defendant disposed of thousands of barrels of drilling waste in pits on the plaintiffs' property, even though it avoided using such pits for many years; and (4) the plaintiffs are entitled to injunctive relief.

Chesapeake also filed a motion for summary judgment arguing: (1) the plaintiffs are bound by a valid release; (2) the plaintiffs are not entitled to injunctive relief when money damages are available; (3) the plaintiffs do not have any common law damage claims; and (4) the plaintiffs have not asserted in their complaint any cause of action pursuant to the West Virginia Oil and Gas Production Damage Compensation Act ("Damage Compensation Act"), W. Va. Code § 22-7-1, _et seq._, and therefore, have waived any such claim.

Both parties filed responses to the motions for summary judgment. In response to the plaintiffs' motion for partial summary judgment, Chesapeake argues: (1) the use of its rights in

the surface estate of the property was reasonable; (2) other jurisdictions support the contention that burial of waste materials does not provide a cause of action for common law trespass; and (3) the plaintiffs' claims for damages may not exceed the fair market value of their damaged property and any claim that may exist under the Damage Compensation Act is limited to the specific remedies allowed by the Damage Compensation Act. Chesapeake also reiterates its arguments that because the plaintiffs executed a valid release in favor of Chesapeake, the plaintiffs' request for equitable relief must be denied in favor of a calculation of monetary damages, and the plaintiffs' damages are speculative because they have offered no scientific or expert evidence to support their claim that the drill cuttings damaged their property.

In their response to Chesapeake's motion for summary judgment, the plaintiffs assert: (1) the release has no bearing on the defendant's permanent waste disposal; (2) injunctive relief is proper because monetary damages are not adequate in this case; (3) the defendant's West Virginia Department of Environmental Protection ("WVDEP") permits do not insulate them from common law liability; and (4) the plaintiffs' common law claims are not precluded by the Damage Compensation Act.

Both parties then filed replies in support of their respective motions for summary judgment. In its reply, Chesapeake reiterates that the plaintiffs' releases cannot now be repudiated, their

damages remain speculative, and their common law claims should be rejected.   In their reply, the plaintiffs reassert that their common law claims are not precluded by the Damage Compensation Act. The plaintiffs' motion for partial summary judgment and Chesapeake's motion for summary judgment are both pending before this Court.[1]   For the reasons stated below, this Court finds that the plaintiffs' motion for partial summary judgment must be denied and Chesapeake's motion for summary judgment must be granted in part and denied in part.[2]

## II.   Facts

The Whitemans own the surface of a roughly 101-acre parcel in Wetzel County, West Virginia known as Johnson Ridge.[3]   The Whitemans live on their property with their son, and with pets and livestock, including roughly one hundred sheep.   Pursuant to two "severance deeds" dated 1952 and 1965 and their own deed, the plaintiffs own the surface of their property outright, but the severance deeds split the mineral estate from the surface estate.

---

[1]The parties appeared at the Wheeling point of holding court on May 31, 2012 for oral argument on the motions for summary judgment.

[2]The undersigned judge's tentative rulings on the motions for summary judgment were set forth in a letter dated June 4, 2012. The letter was docketed and made a part of the record in this case. (ECF No. 65.)

[3]Martin Whiteman acquired this land in 1992 subject to earlier recorded covenants and other restrictions.

4

Chesapeake operates three natural gas wells on a ten-acre section of the plaintiffs' property pursuant to its lease of mineral rights.[4]  The plaintiffs did not lease these mineral rights to Chesapeake, rather, Chesapeake's rights flow entirely from its lease with a third party, a prior lessee, whose rights flow from the deeds severing the minerals.  However, the parties do not dispute that Chesapeake owns the rights to the minerals underlying the plaintiffs' land.  Further, the parties agree that Chesapeake obtained well work permits and pit waste discharge permits from the WVDEP for the construction and management of all gas wells located on the Whiteman property.[5]  (Def.'s Mot. for Summ. J. Ex. 2.) According to the plaintiffs, the land where the well pad is located was a hay field that produced a substantial crop of hay for their sheep.

During Chesapeake's drilling operations, large volumes of drill cuttings (the pieces of rock and earth dislodged by the drill as it creates a bore hole), mud, and chemical additives were brought to the surface and placed into two lined pits created by Chesapeake on the plaintiffs' property.  Eventually, Chesapeake removed the plastic liner from the bottom of the pits, leaving the waste in the open ground.  The waste pits were then covered with

---

[4]The gas wells are numbered 625599, 627375, and 627374.

[5]The parties have stipulated that all wells drilled on the plaintiffs' property were drilled and operated pursuant to valid permits issued by the WVDEP.  (Stipulation of Facts ¶ 2.)

clean soil from the plaintiffs' property.  The pits remain in this condition today, and the plaintiffs allege that the ten-acre portion of land on which Chesapeake installed its gas wells is now unfit for any suitable use.  Chesapeake's appraiser, David Shreve, has asserted that the plaintiffs' property has suffered no diminution in value due to Chesapeake's operations on the property. (Def.'s Mot. for Summ. J. Ex. D.)

The plaintiffs executed a written damage release for "all claims or causes of action for the damages resulting from the construction of a Well Location, and Access Road, associated with the 625599 Well." (Def.'s Mot. for Summ. J. Ex. E.)  Regarding the scope of the release, the parties agree that it applies only to damages resulting from well number 625599, and that the release does not apply in any way to the pit containing drill cuttings and other materials from well number 627374 and well number 627375. (Joint Supplemental Stipulation ¶¶ 4-5.)  The parties have also stipulated that the defendant no longer places drill cuttings on-site in West Virginia and that the defendant used off-site disposal at other locations for at least five years prior to the placement of cuttings on the plaintiff's property. (Stipulation of Facts ¶ 2.)

### III.  Applicable Law

Under Rule 56(c) of the Federal Rules of Civil Procedure,

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in
> the record, including depositions, documents,
> electronically stored information, affidavits
> or declarations, stipulations . . .
> admissions, interrogatory answers, or other
> materials; or
> (B) showing that the materials cited do not
> establish the absence or presence of a genuine
> dispute, or that an adverse party cannot
> produce admissible evidence to support the
> fact.

Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718-19 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). However, as the United States Supreme Court noted in Anderson, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v.

7

Smith, 597 F.2d 406, 414 (4th Cir. 1979)(stating that summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir. 1950))).

In Celotex, the Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Summary judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. See Oksanen v. Page Mem'l Hosp., 912 F.2d 73, 78 (4th Cir. 1990), cert. denied, 502 U.S. 1074 (1992). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

IV.   Discussion[6]

A.   Trespass Claim

---

[6]The plaintiffs' motion for partial summary judgment and the defendant's motion for summary judgment address many of the same issues.  Therefore, this Court sees no need to address each issue separately in reference to each party's dispositive motion.

As the parties in this case acknowledge, "[i]t is well settled in West Virginia that one who owns subsurface rights to a parcel of property has the right to use the surface of the land in such a manner and with such means as would be fairly necessary for the enjoyment of the subsurface estate." Depeterdy v. Cabot Oil & Gas Corp., No. CA-97-966-2, 1999 WL 33229744, at *2 (S.D. W. Va. Sept. 13, 1999) (citing Squires v. Lafferty, 121 S.E. 90, 91 (W. Va. 1924)). The West Virginia Supreme Court of Appeals has held that the issue of unreasonable use is one to be determined by the court.

> [W]e do not think that whether the plaintiff's rights have been invaded, or whether the defendant has exceed its rights are questions of fact for determination of the jury. In a case where there is a dispute of fact, the jury should find the facts, and from such finding of facts by the jury it is the duty of the court to determine whether the use of the surface by the owner of the minerals has exceeded the fairly necessary use thereof, and whether the owner of the minerals has invaded the rights of the surface owner, and thus exceeded the rights possessed by the owner of such minerals.

Adkins v. United Fuel Gas Co., 61 S.E.2d 633, 724 (W. Va. 1950). The United States Court of Appeals for the Fourth Circuit has confirmed that the rule of Adkins is binding on a federal court sitting in diversity. Justice v. Pennzoil Co., 598 F.2d 1339, 1343 (4th Cir. 1979) ("The court will then determine as a matter of law whether Pennzoil has exceeded its right to fairly and reasonably use the surface for enjoyment of its mineral estate."). The parties in this action have agreed and stipulated that Chesapeake holds lease rights to the minerals beneath the plaintiffs'

property.  (Stipulation of Facts ¶ 1.)  Thus, this Court need only determine whether Chesapeake's use of the plaintiffs' land was fairly necessary to the extraction of the natural resource under the circumstances.  The plaintiffs' common law trespass action can only survive if this Court finds that Chesapeake's use of the property was unreasonable.  See Depeterdy, 1999 WL 33229744, at *3 (finding that because the plaintiff did not allege that the defendant exceeded the fairly necessary use of plaintiff's property, plaintiff's common law trespass claim fails).

In considering whether Chesapeake's use of the land was fairly necessary to the enjoyment of its rights, this Court first looks to the rights given or reserved to Chesapeake in the severance deed and the oil and gas leases.  The 1952 recorded deed pertaining to the reservation of a mineral interest ("severance deed") provides:

> THERE IS RESERVED AND EXCEPTED unto the said Ellis O. Miller, grantor, all of his interest in and to the oil and gas within and underlying the above-described parcels as well also as all of the coal not heretofore conveyed, and all other minerals within and underlying the above-described property, **with the necessary rights and privileges appertaining thereto**.

(Pls.' Mot. for Partial Summ. J. Ex. B) (emphasis added).  The April 3, 1963 lease, entered into between Russell and Christina Gilbert and The Manufacturers Light and Heat Company ("Light and Heat Co."), leases unto Light and Heat Co. the right "to enter upon said land to explore and drill for, produce and market all such oil and gas thereunder, to utilize such land and the underlying strata

or sands, including the oil and gas formations, for injecting, storing and withdrawing gas of any kind."[7]  (Def.'s Mot. for Summ. J. Ex. 1.)   The June 12, 2008 oil and gas lease between the Whitemans and Chesapeake leases to Chesapeake:

> [A]ll the oil and gas . . . underlying the land herein leased, **together with such exclusive rights as may be necessary or convenient for [Chesapeake]**, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not limited to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, cease to operate, plug, abandon, and remove wells; to use or install roads, electric power and telephone facilities, and to construct pipelines with appurtenant facilities . . . to store gas of any kind underground . . . including the injecting of gas therein and removing the same therefrom; to protect stored gas; to operate, maintain, repair, and remove material and equipment.

(Def.'s Mot. for Summ. J. Ex. 1) (emphasis added).  None of these documents expressly provide that Chesapeake has a right to construct pits to collect drill cuttings and other materials on the plaintiffs' land.  At best, the severance deed and the oil and gas leases provide an implied right to create pits for drill cuttings, as long as those pits are considered a necessary right appertaining to the exploration, development, production, or measurement of the oil and gas.

-----

[7]The plaintiffs contend that this is the lease covering the subject property -- the land upon which Chesapeake disposed of its waste.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. 5.)

Whether the above-described documents can be construed by implication to permit Chesapeake to construct pits for drill cuttings is a key question for this Court. In <u>Buffalo Mining Co. v. Martin</u>, 267 S.E.2d 721 (W. Va. 1980), the Supreme Court of Appeals of West Virginia held that a mineral severance deed containing comprehensive language concerning surface use, including the right to "telephone and telegraph lines" and a general grant of "all proper and reasonable rights and privileges for ventilating and draining the mines and wells" could be construed by implication to permit a surface easement for an electric line for purposes of ventilation of the coal mine. Justice Miller's opinion in <u>Buffalo Mining Co.</u> cites other persuasive authority in which the issue of rights by implication is raised. In <u>Creasey v. Pyramid Coal Corp.</u>, 61 N.E.2d 477 (Ind. 1945), the Appellate Court of Indiana held that "[t]he terms of the grant are so broad and all inclusive that it is clear to us that the grantors intended to give the grantees any and all rights reasonably necessary to the maintenance and operation of the said mine[,]" which included a high-voltage electric transmission pole line. <u>Id.</u> at 479; <u>see also</u> <u>Trivette v. Consolidation Coal Co.</u>, 177 S.W.2d 868 (Ky. 1944) (holding that where the deed of minerals and mining rights conferred the right to use the surface for enjoyment of rights conveyed and to erect necessary equipment, the right to construct a power line was authorized though not literally expressed in the deed); <u>Flannery v.</u>

Utilities Elk Horn Coal Co., 138 S.W.2d 988 (Ky. 1940) (holding that a provision in the mineral deed giving the grantees an easement for the construction and operation of tramroads deemed necessary and convenient in mining operations included the right to construct telephone and transmission lines on the right of way of their tramroad, though not specifically mentioned in the deed).

In West Virginia, courts have similarly held that in the absence of any express intention to the contrary, a defendant may be deemed to have been given the normal implied mining rights in addition to those specified in the deed. Cole v. Ross Coal Co., 150 F. Supp. 808, 815 (S.D. W. Va. 1957), aff'd, 249 F.2d 600 (4th Cir. 1957); see also Coffindaffer v. Hope Natural Gas Co., 81 S.E. 966 (W. Va. 1914) (stating that a person having the right to go upon another's land "to bore and develop said land for oil and gas, with the necessary usual and convenient rights" has the right to build a road over the land, when necessary to haul machinery and material to the place selected for drilling a well).

Although these cases provide some insight as to what rights to surface use by a mineral owner will be implied, none of these cases discuss the use of pits for drill cuttings and other materials. This Court acknowledges that:

> [W]here implied as opposed to express rights are sought, the test of what is reasonable and necessary becomes more exacting, since the mineral owner is seeking a right that he claims not by virtue of any express language in the mineral severance deed, but by necessary implication as a correlative to those rights expressed in the deed. In

13

order for such a claim to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner.

Buffalo Mining Co., 267 S.E.2d at 725-26.  Thus, in determining whether the language of the severance deed and leases creates an implied right to construct drill cuttings pits, this Court must return to the question of whether that right is reasonably necessary for the extraction of the mineral and whether the pits substantially burden the surface.

In analyzing whether pits for drill cuttings are a necessary right appertaining to the development of the mineral interest, this Court looks to the West Virginia Code and the regulations of the WVDEP.  While it is true that "a permit granted by an agency does not act to immunize the permit holder from civil tort liability from private parties for actions arising out of the use of the permit[,]" the WVDEP permits can serve to inform this Court of the practices of the oil and gas industry in West Virginia.  FPL Farming Ltd. v. Envtl. Processing Sys., L.C., 351 S.W.3d 306, 310 (Tex. 2011).  The well work permits in this case were issued pursuant to Chapter 22 of the West Virginia Code.  With regard to pits containing drill cuttings, the West Virginia Code sets forth reclamation requirements, including the instruction that "[w]ithin six months after the completion of the drilling process, the operator shall fill all the pits for containing muds, cuttings,

14

salt water and oil that are not needed for production purposes, or are not required or allowed by state or federal law or rule and remove all concrete bases, drilling supplies and drilling equipment." W. Va. Code § 22-6-30(a). Thus, Chesapeake's decision to fill in the pits on the Whiteman's property was an act contemplated by West Virginia law.[8]

West Virginia has also promulgated regulations and rules governing horizontal well development. The West Virginia Code of State Rules provides that "[a]ll drill cuttings and associated drilling mud generated from well sites . . . shall be disposed of in an approved solid waste facility or managed on-site in a manner

_____

[8]On December 14, 2011, the West Virginia Natural Gas Horizontal Well Control Act ("Horizontal Well Act"), W. Va. Code § 22-6A-1 et seq., which was enacted to more adequately address the new technologies and practices for conventional oil and gas operations, became effective. The Horizontal Well Act states, in part: "In some instances [the practice of drilling for natural gas contained in underground shales and other geologic formations] may require the construction of large impoundments or pits for the storage of water or wastewater." W. Va. Code. § 22-6A-2(a)(3). A "pit" is defined as "a man-made excavation or diked area that contains or is intended to contain an accumulation of process waste fluids, drill cuttings or any other liquid substance generated in the development of a horizontal well and which could impact surface or groundwater." W. Va. Code § 22-6A-4(b)(10). The Horizontal Well Act also discusses the certificate of approval required for large pits or impoundment construction and provides that if a pit is to be constructed, notice must be provided to property owners. W. Va. Code §§ 22-6A-9 and 22-6A-10. Moreover, the Horizontal Well Act sets forth reclamation requirements for all pits and impoundments. W. Va. Code § 22-6A-14. Although the Horizontal Well Act was enacted after the pits were constructed on the Whiteman's property, it serves to show that the practice of using pits to collect drill cuttings is one that is still recognized and regulated by West Virginia law.

otherwise approved by the Secretary." 35 C.S.R. § 8-4.3. Drilling waste, including drill cuttings, can be disposed of into pits and subsequently buried, pursuant to the reclamation plan described in 35 C.S.R. § 4-16.4.

The discussion of pits and impoundments in the statutes, rules, and regulations governing the exploration, drilling, storage, and production of oil and natural gas, suggests that the creation of the pits on the Whiteman's property was necessary and reasonable. Although the parties have stated that it is no longer Chesapeake's practice, at least in West Virginia, to place drill cuttings on-site, there is no law to suggest that the West Virginia legislature has banned on-site pits from use. Prior to the commencement of the well work on the plaintiffs' land, the Whitemans were given an opportunity to file comments regarding the permits and attached documents, which included a permit for oil and gas waste pit discharge and maps with pit locations drawn. On April 25, 2007, the Whitemans signed a voluntary statement of no objection. The failure to object to the permits does not prevent the Whitemans from bringing a common law trespass claim, but it does indicate that the Whitemans were aware of Chesapeake's intention to dig waste pits and yet they raised no concerns during the pendency of the permit application process.

Earlier this year, the United States District Court for the District of North Dakota decided a case that is factually similar

16

to the case before this Court.   In <u>Kartch v. EOG Res., Inc.</u>, No. 4:10-cv-014, 2012 WL 661978 (D. N.D. Feb. 29, 2012), the plaintiffs alleged that the liner and waste remaining in a reserve pit created in connection with a drilling operation constituted a trespass and caused unnecessary damage to the surface estate.   <u>Id.</u> at *3.   In response to the plaintiffs' allegations, defendant EOG Resources, Inc. ("EOG") argued that it is entitled to use a reserve pit as a matter of law because the North Dakota Industrial Commission regulates and permits reserve pit use.   <u>Id.</u>   In the alternative, EOG argued that if common law principles apply, the use of a reserve pit is reasonable and within EOG's rights as the dominant estate owner.   <u>Id.</u>   Before discussing the reasonableness of the reserve pit, the <u>Kartch</u> court first noted:

> Whether the express uses are set out or not, the mere granting of the lease creates and vests in the lessee the dominant estate in the surface of the land for the purposes of the lease; by implication it grants the lessee the use of the surface to the extent necessary to a full enjoyment of the grant.

<u>Id.</u> at *6 (quoting <u>Texaco, Inc. v. Faris</u>, 413 S.W.2d 147, 149 (Tex. 1967)).   In addressing EOG's contention that its use of a reserve pit is not unreasonable because the North Dakota Industrial Commission permits and regulates their use, the court stated "compliance with a rule or statute is evidence of reasonableness, but it is not dispositive as to an activity's reasonableness."   <u>Id.</u> at *8 ("Accordingly, the fact that the North Dakota Industrial Commission's rules permit the use of a reserve pit is evidence that

17

EOG's use of a reserve pit, rather than a closed-loop system,[9] is reasonable but is not dispositive.").

Turning to the reasonableness of the reserve pit, the Kartch court rejected the plaintiffs' argument that the pit was unreasonable given the alternative of a closed loop system, finding that "the existence of an alternative is not sufficient to render the developer's use of the land unreasonable." Id. at *10. The Kartch court held that at the time when EOG drilled and reclaimed the well, reserve pits, rather than closed loop systems, were commonly used in North Dakota. Id. Therefore, the court found as a matter of law that EGO's use of a reserve pit was not unreasonable. Id. Additionally, the court held that "the burying of waste and the use of a synthetic liner in a reserve pit does not constitute a trespass under North Dakota law."[10] Id. at *20.

Like the plaintiffs in Kartch, the Whitemans argue that the use of the pits was unreasonable because an alternative existed -- specifically, the closed-loop system. The Whitemans highlight the deposition transcript of Mark Bottrell, field manager for

---

[9]A closed-loop system is one in which there is no on-site disposal of any waste produced or created during the drilling, completion or other operations phrase associated with the well. See Bottrell Dep. 48:14-24 (stating that in a closed-loop system, there is no pit dug).

[10]The court did, however, allow the parties to conduct limited discovery regarding the effects of the reserve pit, the tear in the liner, and any potential resulting contamination. Kartch, 2012 WL 661978, at *20.

Chesapeake's Eastern Division from 2009 to 2011, in which he states that pits are no longer part of Chesapeake's procedure.  (Bottrell Dep. 119:7-19, Sept. 22, 2011.)  Citing cases out of New York and Alabama, the plaintiffs also argue that it is well established that the disposal of residual industrial waste on the surface owner's land is a trespass.  These cases, however, do not discuss drill cutting pits created in connection with natural gas wells.  See Phillips v. Sipsey Coal Mining Co., 118 So. 513, 530-31 (Ala. 1928) (stating that in the absence of an agreement, express or implied, the lessee of a coal mine has no right to dump upon the surface of the leased premises slate and refuse taken from adjoining land not owned by the lessor); Marvin v. The Brewster Iron Mining Co., 1874 WL 11019, at *4 (N.Y., Jan. 27, 1874) (finding that the defendant had no right to keep on the plaintiff's land any ore, refuse, rubbish, barn, stable, blacksmith shop, or other building); Hooper v. Dora Coal Mining Co., 10 So. 652, 654 (Ala. 1892) (holding that the frequent and continuous deposit of vast quantities of slate on lands valuable and used for agricultural purposes, and the emptying of foul or filthy water pumped from the mines, deteriorates the value and usefulness of the land and permanently injures its future use and enjoyment).  As the Marvin court noted, the concept of necessity is "not fixed and unvarying[,]" but mineral rights may be "exercised in a manner suitable to the business being carried on."  Marvin, 1874 WL 11019, at *9.  This Court finds that the placement

19

of drill cuttings in pits on the Whiteman's property was suitable and reasonable to the natural gas operation.

This Court is sympathetic to the Whiteman's concerns about their surface property and acknowledges that the closed-loop system now utilized by Chesapeake in West Virginia may pose less risk to landowners, as well as to the land itself. As Mr. Bottrell stated during his deposition, closed-loop natural gas operations are cleaner, more sanitary, leave a lesser footprint, and "make landowners happy." (Bottrell Dep. 55:9-13; 57:3-7; 60:5-10.) However, this Court agrees with the reasoning of the <u>Kartch</u> court and finds that the mere fact that Chesapeake eventually migrated to a closed-loop system does not render its prior use of pits unreasonable, especially given the West Virginia law currently in place regulating the use of the pits. Accordingly, based upon West Virginia law and the facts in this case, this Court finds that the plaintiffs' trespass claim fails, and the motion for partial summary judgment must be denied.[11]  To the extent the defendant's motion for summary judgment argues that the pits do not constitute a trespass, it is granted.

---

[11]Because this Court finds that Chesapeake's use of pits for drill cuttings on the plaintiffs' land is not a trespass, there is no need to address the question of whether the plaintiffs are entitled to injunctive relief.

B.   <u>The Release</u>

In its motion for summary judgment, Chesapeake argues that all
of the plaintiffs' claims fail due to the fact that the plaintiffs
executed a valid release in favor of Chesapeake for any damages
resulting from the installation of the well pad on, and
Chesapeake's extraction of the minerals from, the Whiteman
property.  The release, dated February 8, 2008, states:

> [The Whitemans do] hereby release and discharge said
> [Chesapeake] its employees, directors, officers, agents,
> contractors or assigns from all claims or causes of
> action for damages resulting from the construction of a
> Well Location, and Access Road, associated with the
> 625599 Well . . . including damages to fences, crops,
> timber, and other surface features in the immediate area
> of the disturbance.

(Def.'s Mot. for Summ. J. Ex. E.)  Included with this release is a
document dated April 25, 2007 and signed by the plaintiffs stating
that they are in receipt of a check from Chesapeake in the amount
of $15,000.00, which is payment for damages as a result of
constructing a road and well location 625599.  (Def.'s Mot. for
Summ. J. Ex. E.)  According to Chesapeake, each well bore on the
pad is covered within the scope of the release.  As noted by the
defendant, the plaintiffs accepted the consideration paid to them
by Chesapeake, and they have never repudiated the releases.

In response, the plaintiffs urge that the release, by its
express terms, has no bearing on the defendant's permanent waste
disposal because it does not purport to cover waste disposal at
all.  Instead, the release deals only with the construction of a

21

single access road and a single well location for well number 625599.  According to the plaintiffs, the release prepared by the defendant is limited in scope and deals with conduct not at issue in this action.  Because it does not purport to release any claim for the disposal of waste, the plaintiffs argue, the release cannot reasonably be construed to reflect an agreement that the defendant will be allowed to disturb additional land that is not necessary to the construction of the specified road and well location.

Although not discussed in detail in the summary judgment papers, at oral argument the defendant asserted that the term "Well Location" that appears in the damage release should be defined as the well pad, which includes the multiple bore holes and pits. (Oral Argument Tr. 43:20-25; 44:1-24.)  Using this definition, according to the defendant's view, the release would not be limited to well number 625599.  In support of this position, the defendant argues that the plats and drawings attached to the WVDEP permits describe the well location.  (Oral Argument Tr. 45:6-24.)  This Court has reviewed the plats and drawings and finds that they do not define or describe the "Well Location."  The most logical reading of the documents, in this Court's view, is that the term "Well Location" refers to well number 625599 itself.[12]

---

[12]This Court notes that the drawings accompanying the WW-9 forms specify location by referring to the well number.

On June 1, 2012, the parties filed a joint supplemental stipulation in which they agree that one pit contains drill cuttings and other material from well number 625599, and the second pit contains drill cuttings and other material from well number 627375 and well number 627374.  The parties further agree that the damage release document applies only to damages resulting from well number 625599.  Given this information, this Court finds that the release does not bar the plaintiffs' claims, if otherwise viable, because it is only applicable to well number 625599, which is to say, the bore hole.  Nothing in the release suggests that it includes the drill cutting pits.  Therefore, the defendant's motion for summary judgment must be denied as to its assertion that the plaintiffs are barred by the release.

C.    West Virginia Oil and Gas Production Damage Compensation Act

In its motion for summary judgment, Chesapeake argues that the plaintiffs have not asserted any cause of action pursuant to the Damage Compensation Act, and therefore, they have waived any such claim.  The plaintiffs do not argue this point.  (Oral Argument Tr. 13:5-11, May 31, 2012.)  Rather, the plaintiffs highlight the fact that the Damage Compensation Act explicitly preserves "the common law remedies, including damages, of a surface owner or any other person against the oil and gas developer for the unreasonable, negligent or otherwise wrongful exercise of the contractual right, whether express or implied, to use the surface of the land for the

23

benefit of the developer's mineral interest." W. Va. Code
§ 22-7-4(a). Clearly, the plaintiffs' common law claims are not
precluded by the Damage Compensation Act, and thus, the defendant's
motion for summary judgment is denied insofar as it argues that the
Damage Compensation Act prevents the plaintiffs from recovering
damages under their common law theories of liability, other than
trespass.

D.   <u>Remaining Claims</u>

In addition to their claim of trespass, the plaintiffs'
complaint sets forth the following causes of action: nuisance,
negligence, strict liability, recklessness or gross negligence,
intentional infliction of emotional distress, and negligent
infliction of emotional distress. These claims, however, are not
directly addressed in either of the motions for summary judgment.
At oral argument, counsel for the plaintiffs confirmed that the
only claim he has moved on in his motion for partial summary
judgment is the trespass claim. (Oral Argument Tr. 4:15-20, May
31, 2012) (Pl.'s Reply in Support of Mot. for Partial Summ. J. 11.)
Chesapeake addresses the plaintiffs' other common law claims only
in passing when it argues that the plaintiffs do not have any
common law damages claims as a matter of law because they have
failed to allege that there has been any type of special property
damage that cannot otherwise be characterized as the normal surface
use for the drilling and operation of a gas well. This Court

24

disagrees.   The  complaint  specifically  requests  all  damages
available  at  law  for  injuries  such  as  irritation,  discomfort,
annoyance,  economic  loss,  loss  of  use  and  enjoyment  of  property,
increased  risk  of  disease,  mental  anguish,  emotional  distress,
damage  to  real  and  personal  property,  and  loss  of  property  value.
(Compl. at 13.)   Accordingly,  the  plaintiffs'  common  law  claims,
other  than  trespass,  survive  the  defendant's  motion  for  summary
judgment.

## V.  Conclusion

For  the  reasons  stated  above,  the  plaintiffs'  motion  for
partial  summary  judgment  (ECF  No.  29)  is  DENIED  and  the  defendant's
motion  for  summary  judgment  (ECF  No.  31)  is  GRANTED  IN  PART  AND
DENIED IN PART.

IT IS SO ORDERED.

The  Clerk  is  DIRECTED  to  transmit  a  copy  of  this  memorandum
opinion  and  order  to  counsel  of  record  herein.

DATED:    June 7, 2012


/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE