Appeal: 12-1790   Doc: 35      Filed: 09/04/2013   Pg: 1 of 30

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
————————————

**No. 12-1790**
————————————

MARTIN WHITEMAN; LISA WHITEMAN,

              Plaintiffs - Appellants,

        v.

CHESAPEAKE APPALACHIA, L.L.C.,

              Defendant - Appellee.

————————————

Appeal from the United States District Court for the Northern
District of West Virginia, at Wheeling.  Frederick P. Stamp,
Jr., Senior District Judge.  (5:11-cv-00031-FPS)
————————————

Argued:  March 21, 2013            Decided:  September 4, 2013
————————————

Before TRAXLER, Chief Judge, SHEDD, Circuit Judge, and David A.
FABER, Senior United States District Judge for the Southern
District of West Virginia, sitting by designation.
————————————

Affirmed by published opinion.  Senior Judge Faber wrote the
opinion, in which Chief Judge Traxler and Judge Shedd joined.
————————————

**ARGUED**: Joseph Mark Lovett, APPALACHIAN MOUNTAIN ADVOCATES,
Lewisburg, West Virginia, for Appellants.  Timothy Minor Miller,
ROBINSON & MCELWEE, PLLC, Charleston, West Virginia, for
Appellee.  **ON BRIEF**: Isak J. Howell, LAW OFFICE OF ISAK HOWELL,
Lewisburg, West Virginia, for Appellants.  Joseph K. Merical,
ROBINSON & MCELWEE, PLLC, Charleston, West Virginia, for
Appellee.
————————————

FABER, Senior District Judge:

The plaintiffs below, Martin and Lisa Whiteman (Whitemans), appeal from a final order of the United States District Court for the Northern District of West Virginia that granted summary judgment to the defendant, Chesapeake Appalachia, L.L.C. (Chesapeake), upon the Whitemans' claim for common law trespass. We find no error in the district court's decision and affirm for the reasons that follow.

### I.

### A.

The Whitemans own the surface rights to approximately 101 acres in Wetzel County, West Virginia, pursuant to a general warranty deed dated March 2, 1992. See JA at 93–94. Chesapeake owns lease rights to minerals beneath the Whitemans' surface property. See JA at 608. The property rights of both the Whitemans and Chesapeake ultimately flow from two severance deeds that originally split the surface and mineral estates of the 101 acres relevant here. The two severance deeds effected severance by granting the respective surface estates to grantees while "reserving and excepting" the mineral estate to the grantor. Specifically, both deeds contain the following language:

> THERE IS RESERVED AND EXCEPTED unto the said Ellis O.
> Miller, the grantor, all of his interest in and to the
> oil and gas within and underlying the above-described

> parcels as well as all of the coal not heretofore conveyed, and all other minerals within and underlying the above described property, with the necessary rights and privileges appertaining thereto.

JA at 95, 99.  Notably, the severance deeds neither reserve any specific surface rights to the mineral estate owner nor mention permanent waste disposal resulting from mineral extraction.

Today, the Whitemans live on and farm their 101 acres, primarily raising sheep and, relatedly, using part of the land to produce hay for the sheep.  See JA at 22-23.  Conversely, Chesapeake operates three natural gas wells on approximately ten acres of the Whitemans' property that was formerly used for hay production.  JA at 22, 417.  The Whitemans can no longer produce hay on those ten acres because Chesapeake's well operations and permanent drill waste disposal on the surface have rendered that portion of the Whitemans' property unusable for any suitable purpose.[1]  JA at 258, 264, 420.

Nevertheless, for each of their gas wells located on the Whitemans' surface property, Chesapeake obtained valid well work and pit waste discharge permits from the West Virginia Department of Environmental Protection (WVDEP).  JA at 227, 237, 241, 608.  As part of the permitting process, Chesapeake gave the Whitemans notice of Chesapeake's intent to drill and dispose

---

[1] Martin Whiteman specifically testified in his deposition that any loss of use of his land for farming was limited to ten acres.  JA at 264.

of drill waste in on-site waste pits.  See JA at 230, 244, 246. Chesapeake attached its WVDEP application for well work and pit waste discharge permits to the notice it gave the Whitemans.  JA at 232, 247.  The permit application included spaces for Chesapeake to describe anticipated pit waste as well as proposed disposal methods.  Id.  On each permit application, Chesapeake listed anticipated pit waste to include drill water, frac blow back, and various formation cuttings.[2]  Id.  Chesapeake also noted that it intended to dispose of pit waste by "land application," or in the case of the pits located on the Whitemans' property, by treating water, applying waste to the land, and burying cuttings.  Id.

After the permitting process was complete, Chesapeake began drilling.  While drilling on the Whitemans' property, Chesapeake used a water-based drilling fluid, known in the oil and gas industry as "mud,"[3] to remove drill cuttings during the drilling

---

[2] Drill cuttings consist of earth, rock, and other debris necessarily removed from the ground when the drill bores the well.

[3] Drilling mud comes in many varieties, ranging from water-based fluid mixed with minerals to oil-based fluid with a composition similar to diesel fuel to synthetic oil-based fluid with a composition similar to food-grade mineral oil.  Whatever variety is used, however, mud engineers nevertheless apply "additives" to the mud to ensure efficient and effective use of the mud.  JA at 573.

process.[4]   See JA at 142, 592.   Once removed from the wells' boreholes, Chesapeake disposed of the drill cuttings in accord with the waste disposal method listed on their well work and pit waste discharge permit applications, namely by depositing the drill cuttings into open pits located near the wellheads on the Whitemans' surface property.[5]   See JA at 608.   At the conclusion of the drilling process, Chesapeake removed the plastic liners from the waste pits, mixed the drill waste with clean dirt, and compacted and covered the pits.   Sediment control barriers surround the pits.   See JA at 235.

The pit or "open" system of drill waste disposal was the common method employed in West Virginia at the time the wells were drilled on the Whitemans' property, although alternative disposal methods were used in other areas of the country.   See JA at 119-20, 322, 703.   One such alternative is a "closed-loop" system.   The closed-loop system of drill waste disposal is a relatively recent development in the oil and gas industry. Under the closed-loop system, drill cuttings and other waste are

---

[4] Mud is expensive and operators preserve and recycle as much of it as possible; in some cases, operators will rent drilling mud rather than purchase it.   See JA at 115, 116, 572. Consequently, only a small amount of mud remains mixed with drill cuttings that have been removed from a well.   JA at 572.

[5] In return for valuable consideration, the Whitemans gave Chesapeake a release for any damages caused by Well Number 625599.   See JA at 276, 693.   That well is not implicated in the Whitemans' lawsuit.

removed from the well site and placed in off-site landfills. See JA at 116. Closed-loop systems have some advantages over on-site disposal. They better preserve expensive drilling mud for future drilling operations, eliminate the possibility of a pit failure, and create a smaller drilling operation footprint at a well site. See JA at 116, 120, 572. Nevertheless, closed-loop systems are expensive and often cost $100,000 or more per well than open systems, depending on the well location. See JA at 120, 130. Chesapeake began using the closed-loop system in some of its Oklahoma and Texas operations in 2004 and 2005, and, in December 2009, began preparing to implement the system in West Virginia. See JA at 112, 119.

The Whitemans have admitted that, at present, their monetary damages are "trivial" and "not real significant." JA at 628. Indeed, the only expert testimony offered in the case regarding the value of the Whitemans' land opined that Chesapeake's drilling operations caused no diminution in value thereto. See JA at 267. Rather, the core of the Whitemans' prayer for relief is vindication of their right to exclude others from their land and affirmative injunctive relief to remove the waste pits in order to alleviate the Whitemans' fears of possible future liability that might stem from the waste pits. See JA at 421, 628, 629.

6

B.

This civil action was filed originally in the Circuit Court of Wetzel County, West Virginia, and removed to federal district court on the basis of diversity of citizenship under 28 U.S.C. § 1332(a).  The Whitemans are citizens and residents of West Virginia; Chesapeake is an Oklahoma corporation with its principal place of business in Oklahoma.  JA at 21.  The amount in controversy exceeds $75,000.[6]

---

[6] We note that although the Whitemans have essentially abandoned monetary damages as a remedy in this case, it is generally held that whether the amount in controversy requirement has been met is an issue determined "on the basis of the facts and circumstances as of the time" the case is removed to federal court from state court.  14AA CHARLES ALAN WRIGHT, ARTHUR R. MILLER, AND EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3702.4, p. 457-58 (4th ed. 2011).  At that point, no question arose as to whether the amount in controversy requirement had been met, perhaps because of the numerous amount of claims the Whitemans originally alleged against Chesapeake and the damages associated therewith.  Nevertheless, an affirmative injunction carries its own price tag, and for purposes of determining whether that amount satisfies the amount in controversy requirement, this court "ascertain[s] the value of an injunction for amount in controversy purposes by reference to the larger of two figures: the injunction's worth to the plaintiff or its cost to the defendant."  JTH Tax, Inc. v. Frashier, 624 F.3d 635, 639 (4th Cir. 2010).  Here, the Whitemans present no evidence supporting the requested injunction's value to them in dollar terms.  However, Chesapeake presented evidence that, for a traditional 12,000 cubic foot pit, measuring forty feet by fifty feet with a six foot depth and a seventy percent fill ratio, removing such a pit would cost, at a minimum, $50,000.  JA at 605.  The two pits here have much larger dimensions than a "traditional" pit and, therefore, removing them would easily cost Chesapeake more than $75,000, based on Chesapeake's undisputed testimony related to pit removal costs.  See JA at 250.  Accordingly, the amount in controversy requirement for subject matter jurisdiction in this case is satisfied.

7

In their complaint, the Whitemans asked for an injunction and damages based on claims arising from the drilling and operation by Chesapeake of three natural gas wells on surface property owned by the Whitemans. JA at 33. The complaint alleged claims under West Virginia common law only, namely nuisance, trespass, negligence, strict liability, recklessness or gross negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. JA at 25-32. Cross motions for summary judgment were filed. JA at 90, 211. By order entered on June 7, 2012, the district court denied the Whitemans' motion and granted Chesapeake's motion on the trespass claim only. JA at 760, 765. Thereafter, with the court's approval, the Whitemans voluntarily dismissed all their other claims. JA at 770-71. A final order was entered on June 11, 2012, from which the Whitemans took a timely appeal to this court pursuant to 28 U.S.C. § 1291. JA at 773. The only issue on appeal is whether the district court erred when it granted summary judgment in favor of Chesapeake upon the Whitemans' claim for common law trespass.

II.

A.

In reviewing a grant of summary judgment, we apply de novo the same standard that the district court was required to apply for granting the motion for summary judgment. <u>Ray Commc'ns,</u>

8

Inc. v. Clear Channel Commc'ns, Inc., 673 F.3d 294, 297 n. 1 (4th Cir. 2012).  Specifically, summary judgment is warranted if, from the totality of the evidence, including pleadings, depositions, answers to interrogatories, and affidavits, the court believes no genuine issue of material fact exists for trial and the moving party is entitled to judgment as a matter of law.  See Rule 56(c) of the Federal Rules of Civil Procedure; Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 817 (4th Cir. 1995).  When an appeal arises from a grant of summary judgment, the reviewing court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the non-moving party.  See Laing v. Fed. Exp. Corp., 703 F.3d 713, 714 (4th Cir. 2013).[7]

---

[7] This court has held that Rule 56 of the Federal Rules of Civil Procedure does not allow a court to simply determine that "the moving party has the winning legal argument."  Podberesky v. Kirwan, 38 F.3d 147, 156 (4th Cir. 1994) (citing Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)).  Rather, a court "must also ensure that there is no genuine issue as to any material fact before a grant of summary judgment is proper."  Id.  This situation typically arises, as it does here, where the parties file cross-motions for summary judgment.  Nevertheless, we believe, given the discovery conducted below, the joint stipulations entered into, and the further development of the record at the hearing on the motions for summary judgment, that Chesapeake has satisfied its burden of showing the absence of any genuine issues of material fact, and the Whitemans have either failed or declined to rebut that showing.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

B.

The substantive legal issue before the court on appeal is whether Chesapeake's permanent disposal of drill waste upon the Whitemans' surface property is "reasonably necessary" for the extraction of minerals.[8]  Here, the only relevant substantive law stems from West Virginia common law.  Accordingly, we look to that state's law for a controlling principle.  See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

1.

As noted above, the district court below granted summary judgment in favor of Chesapeake as to the Whitemans' common law trespass claim only.[9]  In West Virginia, common law trespass is

---

[8] After oral argument, and pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, the Whitemans notified this court of a decision from the United States District Court for the Northern District of West Virginia.  Specifically, in the case Cain v. XTO Energy, Inc., Civil Action No. 1:11-cv-111 (N.D.W. Va. March 28, 2013), that court certified a question to the West Virginia Supreme Court of Appeals essentially asking whether horizontal drilling far below the surface, a drilling method now popular in the oil and gas industry, meets the "reasonable necessity" standard under West Virginia law.  That is not this case; it presents a broader question that only marginally overlaps with the narrower one presented here and we see no benefit to certification in this case.  Accordingly, to the extent the Whitemans moved this court to certify the question in this case to the West Virginia Supreme Court of Appeals, that motion is denied.

[9] In the complaint, the Whitemans styled their common law trespass claim as "Trespass (Including Willful and Bad Faith Trespass)."  For our purposes, treating that claim as simple trespass of a continuing nature is sufficient and we proceed

10

"an entry on another man's ground <u>without lawful authority</u>, and doing some damage, however inconsiderable, to his real property." <u>Hark v. Mountain Fork Lumber Co.</u>, 127 W. Va. 586, 591-92, 34 S.E.2d 348, 352 (1945) (emphasis added). A continuing trespass occurs, for example, when one person leaves on the land of another, with a duty to remove it, "a structure, chattel, or other thing." RESTATEMENT (SECOND) OF TORTS § 160 (1965). Regarding remedies for actions in trespass, the general rule in West Virginia is that "a mere trespass to real estate will not be enjoined when the injury . . . is susceptible of complete pecuniary compensation and for which the injured person has an adequate legal remedy." <u>Wiles v. Wiles</u>, 134 W. Va. 81, 91, 58 S.E.2d 601, 606 (1950). Nevertheless, in West Virginia, "[a] court of equity has jurisdiction to enjoin a continuing trespass." <u>Tate v. United Fuel Gas Co.</u>, 137 W. Va. 272, 278-79, 71 S.E.2d 65, 69-70 (1952). Notwithstanding the above, a claim for trespass under West Virginia common law can only lie if one's entry upon the land of another—or one's leaving a "thing" upon the land of another—is "without lawful authority." <u>Hark</u>, 34 S.E.2d at 352.

A common source of "lawful authority" one might have for either entering upon another's land or leaving something on

accordingly; Chesapeake's alleged willfulness or bad faith is irrelevant.

11

another's land is a license.  However, at its most basic, a license is simply "permission, [usually] revocable, to commit some act that would otherwise be unlawful," including, but not limited to, "an agreement . . . that it is lawful for the licensee to enter the licensor's land to do some act that would otherwise be illegal."  Black's Law Dictionary (9th ed. 2009). In West Virginia, however, a line of precedent informs a mineral estate owner's authority to enter upon the land of a surface estate owner, without express license or otherwise, to extract minerals, beginning with Marvin v. Brewster Iron Mining Co., 55 N.Y. 538, 1874 WL 11019 (1874), the seminal 1874 case that introduced the concept of what has come to be known as "reasonable necessity" and its application to severance deed construction.[10]  In other words, in West Virginia, a mineral estate owner that enters upon a surface estate owner's land does

---

[10] We note that in West Virginia, assuming no dispute as to material facts, "it is the duty of the court to determine whether the use of the surface by the owner of the minerals has exceeded the fairly necessary use thereof."  Adkins, 61 S.E.2d at 636.  Moreover, this court has previously held that the West Virginia rule allocating the duty to determine "reasonable necessity" to judge, not jury, binds a federal court sitting in diversity.  Justice v. Pennzoil Co., 598 F.2d 1339, 1343 (4th Cir. 1979).  Accordingly, when we review the lower court's determination of "reasonable necessity," we review its interpretation of West Virginia's "state property law . . . measured by concrete legal standards rooted in the common law." Id. at 1342; see also Depeterdy v. Cabot Oil & Gas Corp., Civil Action No. 2:97-966, 1999 WL 33229744, at *2 (S.D.W. Va. Sept. 13, 1999) aff'd, 230 F.3d 1352 (4th Cir. 2000).

so without lawful authority only if, under the "reasonable necessity" standard, the mineral estate owner "exceed[s] its rights . . . thereby invading the rights" of the surface estate owner. Adkins v. United Fuel Gas Co., 134 W. Va. 719, 723, 61 S.E.2d 633, 635 (1950).

2.

In Marvin, a surface estate owner sought, among other things, to enjoin a mineral estate owner from mining underneath the surface estate owner's land. Marvin, 1874 WL 11019, at *2. The surface estate owner complained that the mineral estate owner had, among other things, deposited "ore and rubbish" (from the mines) along the front and atop the surface estate owner's land. Id. at *3. The lower court in Marvin concluded, as a matter of law, that although the mineral estate owner had a right to enter the surface estate owner's land to mine, the mineral estate owner had "no right to deposit or keep upon [the surface estate owner's] lands any . . . refuse stuff or rubbish." Id. at *4. Accordingly, the lower court ordered that the mineral estate owner be enjoined from further waste disposal on the surface estate owner's land and that the mineral estate owner remove mine waste that the mineral estate owner had already deposited on the surface. Id. at *5. The New York Court of Appeals reversed the lower court as to this conclusion of law, among others, and sent the case back for a new trial

13

because the Court of Appeals believed the lower court failed to consider whether depositing mine waste on the surface was "necessary to be done for the reasonably profitable enjoyment" of the mineral estate owner's property in the minerals. Id. at *17.  More specifically, the Court of Appeals held that a mineral estate owner may not claim, as incident to the grant of the mineral estate itself, "that which is convenient [but] only that which is necessary, but may have that in a convenient way." Id. at *10.  In other words, the court indicated that a grant of minerals underlying a tract of land, absent a deed or lease provision to the contrary, carries with it a right to use so much of the surface as is fairly necessary to recover the mineral and preserve the mineral holder's "reasonably profitable enjoyment" of the mineral.[11]  Although the Marvin court went on to state in dicta that it would be a rare case where a mine owner could justify leaving mine waste on the surface permanently, the court nevertheless conceded that what is necessary is a fluid concept that must be determined on a case by case basis.  See id. at *9 (stating that "the facts of each case" must determine what is necessary).

---

[11] This has come to be called the "fairly necessary" or "reasonably necessary" standard.  We use the two phrases interchangeably just as the West Virginia Supreme Court of Appeals has for over 100 years.

If not earlier, the West Virginia Supreme Court of Appeals cited <u>Marvin</u> with enthusiastic approval in both <u>Porter v. Mack Mfg. Co.</u>, 65 W. Va. 636, 64 S.E. 853 (1909) and <u>Squires v. Lafferty</u>, 95 W. Va. 307, 121 S.E. 90 (1924),[12] thus officially adopting the principle that ownership of a mineral estate carries with it "an implied right to use the surface in such manner and with such means as would be fairly necessary for the enjoyment" of the mineral estate.  <u>Porter</u>, 64 S.E. at 854; <u>see</u> <u>Squires</u>, 121 S.E. at 91 (holding that the right to use the surface "in a manner and with such means as would be fairly necessary" to enjoy the mineral estate is incident to ownership of the mineral estate itself).  Unlike the instant case, however, neither <u>Porter</u> nor <u>Squires</u> were trespass cases. Rather, both were cases where a mineral estate owner sought an injunction against the surface estate owner for obstructing various aspects of the mineral estate owner's mining operation.

In <u>Porter</u>, the mineral estate owner sought to mine clay and other minerals and carry them off using a tram road he proposed to build on the surface estate owner's property, but the surface estate owner obstructed.  <u>See</u> <u>Porter</u>, 64 S.E. at 853.  In

---

[12] The court in <u>Porter</u> indicated that the <u>Marvin</u> principles might be obvious legal underpinnings of West Virginia common law when it noted that "[i]t seems hardly necessary in this mining state to state these principles of law; but it may not be without benefit to do so.  They are old and settled principles." <u>Porter</u>, 64 S.E. at 854.

Squires, the mineral estate owner sought to drill test holes and transport machinery and men over the surface estate owner's property, but the surface estate owner went so far as to lock the mineral estate owner's access gate and then assault the mineral estate owner's employee that forced passage. Squires, 121 S.E. at 90. In both cases, the West Virginia Supreme Court of Appeals ruled in favor of the mineral estate owner, finding the building of a tram road across the surface estate owner's property "fairly necessary" to enjoying the mineral estate in Porter, and finding the drilling of test holes and transport of machinery and men across the surface "fairly necessary" in Squires. Notwithstanding their dissimilarity to this case, Porter and Squires enshrine the overarching principle that, incident to mineral estate ownership, a mineral estate owner in West Virginia has a right to use the surface "in such manner and with such means as would be fairly necessary" to enjoy the mineral estate. Moreover, both Porter and Squires demonstrate that the application of such a principle is necessarily fact-intensive, just as the New York Court of Appeals said in Marvin. See Marvin, 1874 WL 11019, at *9. The "fairly necessary" standard from Porter and Squires has remained intact in West Virginia property law and been applied to a multitude of factual scenarios, including some more factually analogous to this case than either Porter or Squires.

16

3.

In _Adkins v. United Fuel Gas_, a surface estate owner brought a trespass claim against the mineral estate owner for damages caused by the mineral estate owner's gas drilling operations on the surface owner's land.[13]  _Adkins v. United Fuel Gas Co._, 134 W. Va. 719, 61 S.E.2d 633, 634 (1950). Specifically, the mineral estate owner drilled a gas well near the center of a fifty-acre tract, part of which the surface owner used to grow alfalfa, corn, and vegetables.  _Id._ Additionally, the mineral estate owner constructed a road and pipelines through the surface owner's corn and alfalfa fields to provide access to the well.  _Id._  Moreover, the mineral estate owner cut one lengthy ditch to carry water and other refuse from the gas well and cut another ditch to lay a gas pipe necessary to operate the gas well.  _Id._  Both ditches were cut through

---

[13] An earlier case, _Coffindaffer v. Hope Natural Gas Co._, 74 W. Va. 107, 81 S.E. 966 (1914), also involved a surface estate owner bringing a trespass claim against the mineral estate owner.  However, _Coffindaffer_ is distinguishable from both _Adkins_ and this case in that the mineral estate owner there had built a road upon the surface, abandoned any drilling activity before it ever began, but nevertheless left the road on the surface. _Coffindaffer_, 81 S.E. at 966.  Although it recognized, under the "fairly necessary" standard from _Porter_, that a mineral estate owner generally has, "as a necessary incident to the enjoyment" of the minerals, the right to use the surface to explore for and produce oil and gas, including building a road to haul drilling machinery, the _Coffindaffer_ court nevertheless held that where a mineral estate owner builds such a road and abandons drilling before it begins, such a road cannot be fairly necessary to enjoying the rights to the mineral estate.  _Id._

land the surface owner had used to grow crops. Id. As a result of the mineral estate owner's drilling and associated activities, the surface was rendered unusable for crop production. Id.

After it had completed drilling the gas well, the mineral estate owner removed one gas pipe, drained the ditches and covered them over, leaving the permanent gas pipe just under the surface. Id. As to the "reasonable necessity" of the mineral estate owner's use of the surface, the court in Adkins held:

> There was nothing done which was unnecessary or unreasonable in the construction of the road to bring machinery in to drill the defendant's gas well. Likewise the laying of the pipe line over the surface of the land is not disclosed to have been unnecessary. The construction of the open ditch for draining sand, water and other refuse from the well during the drilling thereof seems to have been an effort on the part of defendant to prevent the spreading of such sand, water and refuse over the adjacent surface of plaintiff's land, and, therefore, was a minimization of damages.

Id. at 636. In other words, the court in Adkins did not change the "reasonable necessity" standard. Rather, it simply applied the standard, as it always had before, to a set of facts unique to the case in Adkins.

Perhaps the most recent and comprehensive scrutiny of the "reasonable necessity" doctrine, however, occurred in Buffalo Mining Co. v. Martin, 165 W. Va. 10, 267 S.E.2d 721 (1980). There, as in Porter and Squires, a mineral estate owner sought

to enjoin the surface owner from interfering with the mineral estate owner's mining operations. Specifically, the mineral estate owner endeavored to construct a power line necessary to ventilate a coal mine located under the surface owner's property. _Buffalo Mining_, 267 S.E.2d at 722. However, the court in _Buffalo Mining_ did not simply apply the "fairly necessary" doctrine from _Porter_, _Squires_, _Adkins_, and others. Rather, the court applied the following gloss to that doctrine:

> [W]here implied as opposed to express rights are sought, the test of what is reasonable and necessary becomes more exacting, since the mineral owner is seeking a right that he claims not by virtue of any express language in the mineral severance deed, but by necessary implication as a correlative to those rights expressed in the deed. In order for such a claim to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner.

_Buffalo Mining_, 267 S.E.2d at 725-26 (emphasis added).

Although _Buffalo Mining_ involved a severance deed more detailed than those presented here, its holding nevertheless harmonized the "reasonable necessity" standard as it applies to two divergent types of conflict between mineral estate owners and surface estate owners. The first involves conflicts where the mineral estate owner engages in activity that disturbs, perhaps permanently and negatively, the surface. _See Adkins v. United Fuel Gas Co._, 134 W. Va. 719, 723, 61 S.E.2d 633, 635 (1950) (cutting ditches through surface owner's farmland,

19

permanently burying a gas pipeline used for gas drilling, and spilling oil and oily water on surface owner's crops); Squires v. Lafferty, 95 W. Va. 307, 121 S.E. 90 (1924) (drilling test holes on surface and transporting machinery and men across the surface); Porter v. Mack Mfg. Co., 65 W. Va. 636, 64 S.E. 853 (1909) (construction of tram road on surface to transport minerals).   The second involves conflicts where the mineral estate owner engages in activity that "virtually destroy[s]" the surface or is otherwise "totally incompatible with the rights of the surface owner."   Buffalo Mining, 267 S.E.2d at 725; see Brown v. Crozer Coal & Land Co., 144 W. Va. 296, 107 S.E.2d 777 (1959) (refusing to construe a severance deed to allow "auger mining," which had resulted in slippage of the surface sufficient to uproot trees, toss boulders, and divert streams); W. Virginia-Pittsburgh Coal Co. v. Strong, 129 W. Va. 832, 837, 42 S.E.2d 46, 50 (1947) (refusing to construe a severance deed to allow "strip mining" and reasoning that "if the owner of the surface has a proprietary right to subjacent support . . . he has at least an equal right to hold intact the thing to be supported, i.e., the surface.").   Buffalo Mining's articulation of "reasonable necessity without substantial burden" generally allows the first set of surface uses, when "reasonably necessary," as implicit to a grant of a mineral estate because the surface generally incurs no "substantial burden."

20

Conversely, the second set of surface uses will generally be disallowed as implicit to a grant of a mineral estate; the burden of such uses on the surface is generally so substantial that an explicit deed provision will usually be required.[14]

Before Buffalo Mining, the "reasonable necessity" doctrine simply did not discern between a case where a mineral estate owner drilled a hole into the surface and a case where a mineral estate owner all but removed the surface.  Indeed, the West Virginia Supreme Court very recently noted that it has "often been asked to address disputes between surface owners and mineral owners," and in some cases, it is "sometimes unclear if a particular mineral . . . is a 'mineral' or part of the 'surface.'"  Faith United Methodist Church & Cemetery of Terra Alta v. Morgan, 12-0080, 2013 WL 2920012, at *5 (W. Va. June 13, 2013).  Perhaps more to the point, however, the court noted that in some cases mineral extraction temporarily disturbs the surface and in other cases mineral extraction destroys the surface.  See id.  No matter the degree of disturbance, the court added, "[a]s new minerals are discovered, and as better

---

[14] See, e.g., Phillips v. Fox, 193 W. Va. 657, 665, 458 S.E.2d 327, 335 (1995) (holding that the right to surface mining "will only be implied if it is demonstrated that, at the time the deed was executed, surface mining was a known and accepted common practice in the locality where the land is located; that it is reasonably necessary for the extraction of the mineral; and that it may be exercised without any substantial burden to the surface owner.").

21

techniques for harvesting those minerals become available, legal conflicts between owners of the surface and of the minerals will abound." Ultimately, we believe Buffalo Mining sorts the minor to moderate surface disturbance cases from the major surface destruction cases when a mineral estate owner seeks to do either pursuant to implied rights collateral to a grant of the mineral estate itself.

### III.

The court below acknowledged that the severance deeds in question did not address the issue of use of the property surface to store drill cuttings and other waste but nevertheless found such right to be created by implication as a reasonably necessary incident to creation of a gas well. The Whitemans advance several arguments as to why the lower court's conclusion was erroneous. We address each separately.

### A.

As a threshold matter, the Whitemans essentially argue that Chesapeake had a burden to show its use of the surface was reasonably necessary and did not impose a substantial burden upon the surface, that Chesapeake "failed utterly to develop a record" to support such a showing, and that the court below erred in granting Chesapeake summary judgment as a result. See Appellant Br. at 9, 20. The Whitemans apparently rely, in part, on Buffalo Mining, and no other authority, to support this

22

argument.  See id. at 21 (stating "Chesapeake is subject to Buffalo Mining Company's 'exacting' test in which it must show both necessity and the absence of a substantial burden on the surface.").  The Whitemans miss a fundamental distinction between this case and Buffalo Mining concerning which party would carry the initial burden of proof at trial.  As with any ordinary tort claim, the plaintiff must make an affirmative showing of a prima facie case; the defendant need neither affirm nor rebut anything.  See Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011) cert. denied, 132 S. Ct. 499, 181 L. Ed. 2d 347 (2011) (noting that common law trespass "require[s] that a plaintiff establish that the defendant's conduct produced some 'injury' to the plaintiff or to the plaintiff's property.") (citing Hark v. Mountain Fork Lumber Co., 127 W.Va. 586, 34 S.E.2d 348 (1945)).

In Buffalo Mining, as noted above, the plaintiff was a mineral estate owner seeking to enjoin the surface owner from interfering with the mineral estate owner's mining operations.  Buffalo Mining, 267 S.E.2d at 722.  In other words, the mineral estate owner claimed the surface estate owner was interfering with the former's incidental property rights associated with its grant of the mineral estate.  Accordingly, as the plaintiff, the mineral estate owner in Buffalo Mining had the initial burden of proving that the surface owner's conduct "produced some injury"

23

to the mineral estate owner's incidental property rights. <u>See</u> <u>Rhodes</u>, 636 F.3d at 94. Here, as Chesapeake aptly recognizes, it is the other way around; the Whitemans have sued Chesapeake for trespass and, accordingly, the Whitemans would carry the burden of making a prima facie trespass claim at trial. <u>See</u> Appellee Br. at 13. Moreover, no West Virginia case has treated a mineral estate owner's claim to "reasonably necessary" use of the surface to extract minerals as an affirmative defense. Neither shall we.

Relatedly, the Whitemans argue that the court below failed to analyze the burden that Chesapeake's drilling operations imposed on the surface. Appellant Br. at 38–39. Again, the burden to prove unauthorized entry or use in trespass is on the plaintiff. Nevertheless, the record below supports a finding that the drill waste pits do not impose a substantial burden on the Whitemans' surface property. One of Chesapeake's experts opined that the drill waste pits have not affected the Whitemans' property value at all. JA at 267. The Whitemans failed to rebut this expert opinion, offering none of their own to evaluate the risk that the drill waste pits in this case might slip or break. <u>See</u> Appellee Br. at 8. The only evidence the Whitemans presented regarding potential future liability arising from the drill waste pits was the subjective fear of Lisa Whiteman. <u>See</u> JA at 421. Moreover, counsel for the

24

Whitemans at oral argument below remarked that any pecuniary loss caused by the drill waste pits was minimal. See JA at 628. Martin Whiteman himself stated that any injury to the Whitemans' land that Chesapeake's entire drilling operation might have caused was limited to ten acres. JA at 264.

The Whitemans reply that no expert is needed to prove a common law trespass claim. Appellant Reply Br. at 21. We agree. However, sufficient evidence, at least a preponderance, is needed to prove trespass. The Whitemans simply failed to present sufficient evidence to show that Chesapeake's drill waste pits imposed a "substantial burden" on the surface. Absent that showing, the Whitemans could only satisfy the "unlawful authority" prong of common law trespass by proving Chesapeake's surface use was not "reasonably necessary" to their gas drilling operation. The Whitemans failed in that regard as well.

B.

Regarding "reasonable necessity," the Whitemans first contend that Chesapeake's disposal of waste on-site was not reasonably necessary to operate its wells because an alternative method of disposal, the closed-loop system, was available. See Appellant Br. 4, 20, 23, 25. We disagree. There simply is no support for the Whitemans' implication that "reasonable

25

necessity" amounts to "necessity," otherwise the modifier "reasonable" would be meaningless.[15]

The two wells on the Whitemans' property were drilled between 2007 and 2009. At that time, the closed-loop system was a relatively new method of drill waste disposal. Chesapeake had begun to use the closed-loop system in Texas and Oklahoma beginning in 2004 and 2005, but did not employ it in West Virginia until December 2009. When the Whiteman wells were drilled, the open pit system was the common and ordinary method of disposal in West Virginia and was consistent with permitting requirements in the state and approved by the WVDEP. Nevertheless, the Whitemans apparently believe that comparing drill waste disposal methods between Texas and Oklahoma gas drilling operations on the one hand and West Virginia gas drilling operations on the other hand ought to inform whether Chesapeake's drill waste disposal used on the Whitemans' surface was "reasonably necessary." See, e.g., Appellant Br. at 24 (citing Chesapeake's use of the closed-loop disposal system in Dallas/Fort Worth as an example of why the open pit system is purely optional). Such comparison amounts to false equivalency.

---

[15] Chesapeake similarly attempts to precisely define "reasonable necessity." See Appellee Br. 17-18. Nevertheless, no West Virginia law exists to support Chesapeake's construction of "reasonable necessity," even if sound reasoning otherwise supports it. Accordingly, we decline to adopt Chesapeake's definition of "reasonable necessity" as well.

Indeed, even comparing drill waste disposal methods within all of West Virginia would likely not comport with what a "reasonable necessity" inquiry requires. As noted earlier, we trace the genealogy of West Virginia's "reasonable necessity" standard at least as far back as <u>Marvin v. Brewster Iron Mining Co.</u>, 55 N.Y. 538, 1874 WL 11019 (1874). There, the New York Court of Appeals clearly stated that determining the scope of a mineral estate owner's implicit surface use rights is a factually intensive process and each case should be evaluated accordingly in light of the fact that what is "necessary" is a fluid concept. <u>See</u> <u>Marvin</u>, 1874 WL 11019, at *9. No West Virginia case law has changed the fact-based nature of the analysis. Accordingly, the Whitemans wrongly fault Chesapeake for employing its own case-by-case determination regarding drill waste disposal methods when this court is compelled to do the same to adequately determine whether Chesapeake's surface use was "reasonably necessary" for mineral extraction. <u>See</u> Appellant Br. at 24 (noting that when Chesapeake decided whether to use an open pit or closed-loop system of drill waste disposal, it "simply performed a 'case-by-case' analysis.") (citing Chesapeake representative Mark Bottrell's deposition testimony at JA 127).[16]

_____

[16] We note that Bottrell's deposition testimony regarding Chesapeake's decision-making process as to whether to use open

27

Third, the Whitemans argue that the trial court confused the requisite "reasonably necessary" standard with a "reasonableness" standard, thereby applying a less rigorous rule than the law requires. See Appellant Br. at 9, 18. We need only refer to the specific language of the trial court's opinion to conclude that this argument of the Whitmans is misplaced. The trial court articulated the correct standard as follows:

> Thus, in determining whether the language of the severance deed and leases creates an implied right to construct drill cuttings pits, this Court must return to the question of whether that right is reasonably necessary for the extraction of the mineral and whether the pits substantially burden the surface.

JA at 754.

Fourth, the Whitemans contend that the district court relied on irrelevant state regulations and statutes. See Appellant Br. at 9, 28-30. While the Whitemans are correct in their assertion that West Virginia's regulatory scheme does not create a right of the lessor to commit a trespass if the specific use is not granted or implied in a lease, they

---

or closed drill waste disposal is more sophisticated than the Whitemans suggest. See Appellant Br. at 24 (claiming Chesapeake's decisions to use pits in certain areas in Texas were based "purely [on] the proximity of a person's residence."). Among other things, Bottrell listed well depth, drilling method, surface topography, potential impact on livestock, potential for pit failure or "slippage," and site distance to landfill as factors Chesapeake considers before deciding which waste disposal method to use at any given gas well site. See JA at 120, 122, 123, 128, 605.

misinterpret the lower court's reliance thereon. The court below simply referred to the statutes and regulations in order to "inform this Court of the practices of the oil and gas industry in West Virginia." JA at 754. Moreover, the court below expressly acknowledged that a permit granted by a state agency pursuant to a regulatory scheme cannot immunize the permit holder from civil tort liability for actions arising out of use of the permit. Id. Accordingly, the lower court's reliance on various West Virginia statutes and regulations, and the manner in which it so relied, was not an improper way to adduce some evidence of reasonable necessity.[17]

Finally, the Whitemans claim the court below quoted and emphasized a 2008 mineral lease between the Whitemans and

---

[17] While decided under a slightly different legal standard than the one we apply here, the United States District court for the District of North Dakota recently addressed the same issue in a case whose facts are remarkably similar to those of the case at bar. In that case, Kartch v. EOG Resources, Inc., 2012 WL 661978 (D. N.D. 2012), the surface estate owner contended that drill pit waste left on the surface by the mineral estate owner amounted to trespass. The surface estate owner argued that availability of a closed loop system for deposit of waste off the surface property rendered unnecessary the use of permanent on-site waste storage. The court disagreed and held that, at the time the well was drilled, reserve pits were commonly used in North Dakota. The availability of an alternative, said the court, did not make storage of waste on the land unreasonable. The court also noted that the North Dakota Industrial Commission had issued a permit for the surface waste disposal under appropriate regulations. Compliance with a state regulatory scheme, as in the case here, was deemed to be evidence of reasonableness.

Chesapeake that is not relevant to this case. That lease covered a separate one-acre tract from the ten acres involved here and gave Chesapeake "such exclusive rights as may be necessary or convenient" in its gas production activities. While the court below did refer to that lease in its opinion, the court also made clear that the one-acre lease, including its expansive language, is not relevant to the present case. The standard applied by the trial court, as noted above, was one of reasonable necessity; convenience did not enter into the court's calculation.

IV.

For all these reasons we conclude the district court was correct to hold that creating drill waste pits was reasonably necessary for recovery of natural gas and did not impose a substantial burden on the Whitemans' surface property, that creation of the pits was consistent with Chesapeake's rights under its lease, was a practice common to natural gas wells in West Virginia, and consistent with requirements of applicable rules and regulations for the protection of the environment. Accordingly the decision of the district court is

AFFIRMED.